**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION NO.** |
| **v.** | **1:18-CR-00145-LMM-CMS** |
| **REYNALDO GONZALEZ-ARREOLA,** | |
| **Defendant.** | |

## <u>REPORT AND RECOMMENDATION</u>

This case is before the Court on the following motions: (1) Defendant Reynaldo Gonzalez-Arreola's Preliminary Motion to Suppress Evidence and Request for Evidentiary Hearing Pursuant to <u>Franks v. Delaware</u> (Doc. 45); and Gonzalez-Arreola's Second Motion to Suppress Evidence and Request for an Evidentiary Hearing Pursuant to <u>Franks</u> (Doc. 56).

In a two-count indictment, Reynaldo Gonzalez-Arreola ("Defendant") and two codefendants were charged with possession, and conspiracy to possess, with intent to distribute methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 853(a), and 18 U.S.C. § 2. (Doc. 21, Indictment, at 1-2).

AO 72A
(Rev.8/8
2)

I.   **OVERVIEW**

Defendant is charged with participating in a conspiracy to transport drugs from California to the Atlanta, Georgia area by providing a Drug Enforcement Administration ("DEA") undercover agent with approximately 14 kilograms of methamphetamine and $4,000 in cash at a California outlet mall parking lot on March 20, 2018.  A week later, on March 27, 2018, U.S. Magistrate Judge Justin S. Anand, in the Northern District of Georgia, issued a complaint under seal for the arrest of Defendant. (Doc. 1).  On April 9, 2018, agents searched Defendant's home pursuant to a warrant issued in the Central District of California, and seized drugs, a gun, $23,890 in cash, and ten telephones that were later searched pursuant to a warrant issued in this district.  Defendant seeks to suppress evidence from these searches, arguing that the affidavits in support of the warrants contained material omissions and/or misrepresentations, and he requests a hearing under Franks v. Delaware, 438 U.S. 154 (1978).

The Government opposes Defendant's motions to suppress evidence, arguing that Defendant has failed to make a sufficient preliminary showing to warrant a Franks hearing.  (Doc. 61).  The Government argues that even after setting aside the alleged misrepresentations or adding the alleged omission(s), the affidavits, viewed as a whole,

2

provided a substantial basis for a finding of probable cause.  Accordingly, the Government asks that Defendant's two motions to suppress evidence be denied without an evidentiary hearing.

## II.   **FACTUAL BACKGROUND**[1]

On April 6, 2018, U.S. Magistrate Judge Alka Sagar from the Central District of California issued a search warrant (Doc. 45-1, "First Warrant") for the search of Defendant's residence at 1529 E. 41st Place, Los Angeles, California, 90011 (the "Subject Property"), based on an affidavit of DEA Special Agent Theodore Russell ("Agent Russell") dated April 6, 2018 (Doc. 45-2, "Russell Affidavit").

The First Warrant authorized agents to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, including controlled substances, firearms, U.S. currency, drug paraphernalia, documents related to drug trafficking and communications with conspirators, digital devices used to facilitate the offenses, and materials showing the identity of the persons residing in the Subject Property.  (Doc. 45-1).

---

[1]  To the extent that the facts recited herein are taken from the indictment or amount to law enforcement accusations, the Court recognizes that the statements are allegations only.  The Court is mindful that Defendant is presumed innocent at this stage in the proceedings.

Defendant's initial motion to suppress evidence identified two allegedly false statements or misrepresentations in the Russell Affidavit in support of the First Warrant (Doc. 45 at 5-6):  a statement in Paragraph 10 (and in a heading on page 8) that Defendant received $4,000 from an undercover DEA agent ("UC agent") in exchange for delivering about 15.2 kilograms of methamphetamine to the UC agent at the Citadel Outlet mall parking lot in Commerce, California (Russell Aff. at 6, 8); and  a statement that as part of the transaction in the mall parking lot, Defendant provided $4,000 to the UC agent along with a duffel bag that the UC agent removed from the trunk of Defendant's car, which bag was later determined to contain about 15.2 kilograms of methamphetamine.  (Id. ¶ 19).

Defendant has subsequently withdrawn his contention that the second statement–that he gave $4,000 to the UC agent, along with the duffel bag containing methamphetamine–was false.  (Doc. 59; Doc. 61, Gov't Resp. Br., at 2 n.1). Accordingly, the only statement about which Defendant now complains is the statement that Defendant was paid $4,000 for delivery of methamphetamine to the UC agent as alleged in Paragraph 10 and the heading on page 8 of the Russell Affidavit.  (Doc. 56-2; cf. Doc. 45 at 5-6; Doc. 59).  The Government concedes that this statement is false. (Doc. 61 at 2-3).

4

On June 13, 2018, U.S. Magistrate Judge Linda T. Walker in the Northern District of Georgia signed a search warrant for the ten telephones seized from Defendant's residence pursuant to the First Warrant. (Doc. 56-1, "Second Warrant"). The Second Warrant was based on the affidavit of DEA Special Agent L. Patrick Gray, IV ("Agent Gray") (Doc. 56-2, "Gray Affidavit"). The Gray Affidavit does not contain the same error as the Russell Affidavit, but it also does not disclose the fact that the Russell Affidavit contained that error. Defendant argues that the Gray Affidavit contained a material omission that requires suppression of the fruits of the search of the phones based upon the illegality of the initial search of Defendant's residence– namely, that Agent Gray failed to inform Judge Walker that the Russell Affidavit that supported the seizure of the phones contained the false statement described above (i.e., that Defendant was paid $4,000 for delivering the methamphetamine to the UC agent). Defendant argues that such omission was an intentional effort on the part of the Government to mislead Judge Walker and avoid scrutiny of both affidavits/warrants, and therefore the Leon good faith exception does not apply. (Doc. 56 at 2; Doc. 63 at 10).

With respect to the Russell Affidavit, Defendant argues that if the false statements about being paid $4,000 are excluded, the affidavit fails to set forth

5

sufficient facts to establish probable cause.  Defendant contends that the affidavit also fails to state facts sufficient to justify a conclusion that evidence or contraband would probably be found at Defendant's residence.

With respect to the Gray Affidavit, Defendant argues that Agent Gray's failure to mention in his affidavit that a false statement was included in the Russell Affidavit constitutes a material omission essential to the finding of probable cause.  Defendant argues, therefore, that because the search of the residence was based on a faulty warrant, that the seizure of the phones was illegal, rendering the subsequent search of the phones illegal as well.  According to Defendant, all evidence seized from the seized phones is fruit of the poisonous tree and should be suppressed.  (Doc. 56 at 5-6).

## III.   **DISCUSSION**

As discussed above, Defendant moves to suppress all evidence seized pursuant to the First Warrant and Second Warrant on the grounds that the affidavits in connection therewith did not establish probable cause, and/or contained material misrepresentations and omissions that, had accurate and complete information been provided, would have negated any finding of probable cause.  Defendant has requested a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).  Alternatively, in light of the Government's acknowledgment that the Russell Affidavit did contain a false

statement, Defendant suggests that the Court should suppress the evidence seized during the search of Defendant's residence and all evidence derived from that search, without a hearing.  (Doc. 63 at 9).

### A.   Legal Standard

To be entitled to an evidentiary hearing on a motion to suppress based on misrepresentations in a search warrant affidavit, a defendant must make a substantial preliminary showing that: (1) the affiant made false statements; (2) the false statements were made either intentionally or with reckless disregard for the truth; and (3) the false statements were necessary to the finding of probable cause. See Franks, 438 U.S. at 171-72.   Material omissions from a supporting affidavit may also give rise to entitlement to a Franks hearing.  United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).  The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation

omitted). "'[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id.

"[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." United States v. Bushay, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085 (1984)). Courts are not to "interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. at 1379 (citing United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994)); see also United States v. Robinson, 62 F.3d 1325 (11th Cir. 1995) (requiring the reviewer to afford "great deference" to a judicial determination of probable cause).

Affidavits supporting search warrants are presumptively valid. Franks, 438 U.S. at 171. "Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search

8

warrant affidavit." <u>United States v. Price</u>, 582 F. App'x 846, 850 (11th Cir. 2014).  The allegations of deliberate falsehood or of reckless disregard for the truth must be accompanied by an offer of proof, including a statement of supporting reasons and affidavits of witnesses.  <u>Franks</u>, 438 U.S. at 171.  "Allegations of negligence or innocent mistake are insufficient.  The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant."  <u>Id.</u>  If, after setting aside the material that is the subject of the alleged falsity or reckless disregard, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  <u>Id.</u> at 171-72.

In this case, Defendant has not made a sufficient preliminary showing that Agent Russell intentionally or recklessly included a false statement in his search warrant affidavit and/or that Agent Gray intentionally or recklessly omitted mention of that fact from his affidavit.  Moreover, <u>Franks</u> requires the defendant to offer proof that the affiant had the requisite intent.  <u>See</u> <u>United States v. Flowers</u>, 531 F. App'x 975, 981 (11th Cir. 2013) (citing <u>Franks</u>, 438 U.S. at 171).  Defendant, however, has provided no evidence or witness affidavit establishing that either Agent Russell or Agent Gray intentionally or recklessly made the referenced material false statement or omission, as required under <u>Franks</u>.

9

**B.     The Russell Affidavit and the First Warrant**

Defendant has failed to establish that Judge Sagar made an improper probable cause determination when she authorized the search of Defendant's residence as part of a multi-state drug trafficking investigation into drug shipments from Los Angeles, California to Atlanta, Georgia.

Setting aside the statement in paragraph 10 (and on page 8) of the Russell Affidavit that Defendant contends falsely stated that he received $4,000 from the UC agent during the March 20, 2018 transaction, the Russell Affidavit alleges, among other things, that at all relevant times, Agent Russell was a DEA agent assigned to the DEA Los Angeles Field Division Financial Investigations Group, which investigates large-scale narcotics and money laundering organizations.  (Doc. 45-2, Russell Aff., at 3-6). The affidavit alleges that Agent Russell participated in a criminal investigation, along with other federal and local investigators, involving individuals who were believed to be involved in a drug conspiracy sending drugs from locations in the United States, including Los Angeles, California, to the Atlanta, Georgia area, in violation of federal laws, including 21 U.S.C. §§ 841, 843(b), and 846.  (Id. ¶ 11).

Among the remaining facts included in the Russell Affidavit (or that can be inferred from the affidavit) are the following:

10

- In March 2018, DEA agents in Atlanta received information from a confidential source ("CS") that a man named "Fernando," using telephone number 501-414-7682, was responsible for coordinating a shipment of drugs from Los Angeles to Atlanta.  (Russell Aff. ¶ 12).  DEA agents in Atlanta decided to introduce an undercover agent to act as the transporter who would pick up the drugs for Fernando.  (<u>Id.</u>).

- On March 14, 2018, the UC agent placed a recorded call to Fernando Herrera-Rojas (Defendant's co-defendant, hereinafter "Fernando") to discuss transporting the drugs.  Fernando said he had "stuff" that needed to be picked up in Los Angeles and brought back "here" to Atlanta, but he advised the UC agent not to travel on Interstate 10 because in the past, another driver for the organization drove on I-10 against orders, got stopped, and "lost it."  (<u>Id.</u> ¶ 13).

- That same day, Yadira Gomez-Gonzalez (another co-defendant, hereinafter "Yadira") called the UC agent in a call that was recorded.  (<u>Id.</u> ¶ 14).   Yadira identified herself as Fernando's wife, and discussed logistics for the UC agent to receive a drug shipment in Los Angeles and transport the drugs to Atlanta.  (<u>Id.</u>).  She confirmed that the UC agent

11

could pick up the drugs on March 20th and said he would be paid $300-$400 per unit of drugs, depending on the speed of the delivery.  (Id. ¶ 15).

- On March 20, 2016, the UC agent and Yadira exchanged several recorded calls, during which Yadira stated that the UC agent would receive "14" (meaning 14 kilograms of drugs), and an associate of hers would contact the UC agent to drop off the shipment.  (Id. ¶ 16).

- Later the same day, the UC agent received a call from Defendant from telephone number 310-525-0798.  (Id. ¶ 17).  During this recorded call, Defendant agreed to meet the UC agent at the Citadel Outlets in Commerce, California.  (Id.).  At 11:20 a.m., Defendant called the UC agent again and said that he was driving a black Toyota Corolla.  (Id. ¶ 18).  At approximately the same time, agents conducting surveillance saw a black Toyota Corolla park behind the UC agent's car in the parking lot.  (Id.).

- The UC agent got out of his car and spoke with Defendant, who instructed the UC agent to go to the trunk of the black Toyota Corolla.   (Id. ¶ 19). The UC agent went to the trunk of Defendant's vehicle and removed a large black duffel bag and placed it in the UC agent's vehicle.  (Id.).

12

Defendant paid the UC agent $4,000 for picking up the duffel bag, which was later ascertained to contain about 15.2 kilograms of methamphetamine.  Defendant then drove away in the Toyota Corolla. (<u>Id.</u>).

- Surveillance units identified Defendant as the owner of the car by his license plate information and driver's license photograph obtained from the Department of Motor Vehicles' ("DMV") records associated with the black Toyota Corolla's license plate.  The UC agent also identified Defendant's driver's license photograph as the same individual who was driving the Toyota Corolla.  (<u>Id.</u> ¶ 18).  DMV records and Defendant's driver's license listed his residence as 1528 E. 41st Place, Los Angeles, California, the same address as the Subject Property.  (<u>Id.</u> ¶¶ 1, 24).

- After Defendant left the outlet mall parking lot, agents followed him as he drove the black Toyota Corolla directly to the Subject Property, where he parked on the apron of the driveway and entered the residence through the front door.  (<u>Id.</u> ¶ 20).  Approximately ten minutes later, surveillance units observed Defendant walk out of the home, get back into the black Toyota

13

Corolla, and drive away. (Id.). They followed him and ended surveillance in downtown Los Angeles. (Id.).

- That same day, DEA agents transported the black duffel bag, which contained thirty-four individually wrapped packages weighing a total of 15.2 kilograms, to the DEA office in Los Angeles. The substance inside the packages tested positive for the presence of methamphetamine, a Schedule II controlled substance, and was submitted to the DEA laboratory for further analysis. (Id. ¶ 21).

- The UC agent then completed the planned transaction in Atlanta with Fernando and Yadira. (Id. ¶ 22). On March 26, 2018, the UC agent provided Yadira and Fernando with thirty-four bundles of sham methamphetamine in the Atlanta area. (Id.). Agents saw Yadira and Fernando take the sham methamphetamine to their home, where the agents executed a search warrant and arrested Yadira and Fernando. (Id.).

- The next day, agents filed criminal complaints in the Northern District of Georgia charging Yadira, Fernando, and Defendant with drug conspiracy and intent to distribute a controlled substance in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) and obtained arrest warrants for them. (Id. ¶ 23).

14

AO 72A
(Rev.8/8
2)

- On April 3, 2018, agents saw Defendant's Toyota Corolla parked outside the Subject Property.  (<u>Id.</u> ¶ 25).

In his affidavit, Agent Russell averred that he has worked for the DEA since September 2012, and his duties included investigating drug and money laundering organizations.   His affidavit provides general background information about the practices of drug traffickers based on Agent Russell's personal observations, as well as his training and experience.  (<u>Id.</u> ¶¶ 3, 26).   Agent Russell avers that in his experience, drug traffickers often store drugs, firearms, packaging materials, documents, and other items related to the possession and distribution of drugs in their homes and cars, where they are readily available, yet are concealed from law enforcement.  (<u>Id.</u> ¶ 26(c)).  Agent Russell further avers that drug traffickers often sell drugs on credit to their customers and keep records in their homes to keep track of the amounts owed.  (<u>Id.</u> ¶ 26(d)).  He avers that because drug trafficking is a business that often involves numerous co-conspirators, traffickers commonly maintain lists of names, aliases, phone numbers, and other identification information in their homes, in their cars, and in telephones and digital devices where the information is readily available. (<u>Id.</u> ¶¶ 26(h), 28).

15

After removing the misstatement about Defendant receiving $4,000 from the UC agent in exchange for delivering the drugs, the Russell Affidavit still sufficiently describes a complex pattern of activity by Defendant and his codefendants to transport drugs from California to Georgia.  The facts describing the UC agent's calls with Yadira and Fernando, Fernando's comments about a previous seizure on I-10, Yadira's discussion of the variable payment depending on the speed of the delivery, and their search for a new driver suggest prior drug shipments by the co-conspirators.  After the UC agent traveled to California in compliance with the plan discussed over multiple calls, Yadira told the UC agent that an associate would contact him to drop off the shipment.   Shortly thereafter, Defendant called the UC agent and arrived at the designated location with drugs and money.  This sequence of events suggests that Yadira and/or Fernando communicated with Defendant about the transaction. Moreover, Defendant was the individual in California with physical access to the drugs and money, whereas Yadira and Fernando appeared to be in Texas or the Atlanta area waiting for the drugs to arrive.  (Russell Aff. ¶¶ 12-16; Doc. 56-2 at 18, 24).  After the transaction in the California parking lot, Defendant drove directly to the Subject Property, which according to the DMV database, was Defendant's home and a place where Defendant's  car was later seen parked.

16

Defendant argues that at most, what the Russell Affidavit indicates is that Defendant delivered a suitcase and some money to the UC agent, but there are no facts to support a finding of probable cause that Defendant knew what the suitcase contained. Defendant claims that his knowledge about the contents of the suitcase is key to any finding of probable cause.

To support his contention that he did not know what was in the suitcase, he asserts that transcripts of his conversations with the UC agent do not mention drugs or money.  He also claims that the purpose of concealing the drugs in a suitcase was to conceal from him the true nature of what was being delivered.  He argues (unconvincingly) that the Russell Affidavit establishes nothing more than him acting in the role of a commercial carrier, such as FedEx or UPS, making a delivery to a third party. (Doc. 63 at 7).  Defendant also argues that the Russell Affidavit fails to establish a nexus between Defendant and his residence and between Defendant and drug trafficking because it does not show that any informant linked Defendant to drug trafficking; there are no recorded phone calls that link him to drug trafficking; there were no prior investigations linking him to drug trafficking; and no wiretaps link him to drug trafficking.  (Id. at 8).

Defendant's arguments are without merit.  The question before this Court is

17

whether the affidavit in support of the First Warrant established a fair probability that evidence of drug trafficking activity would be found at Defendant's residence (once the alleged false statement is removed from the affidavit).  As discussed above, even without the alleged false statement, the affidavit sufficiently links Defendant to his co-defendants/co-conspirators by showing that Yadira and Fernando were under investigation for drug trafficking activity between California and Atlanta; after numerous recorded conversations between the DEA's UC agent, Fernando, and Yadira, Defendant contacted the UC agent by telephone at the apparent behest of Yadira to arrange for delivery of a  suitcase or duffel bag (containing over fourteen kilograms of illegal drugs) at a location in Commerce, California.  Defendant drove his own vehicle to the designated parking lot, met with the UC agent, directed him to retrieve the bag from the trunk of the car, and apparently gave the UC agent $4,000.  Defendant's identity and address were confirmed through DMV records, the UC agent, and other surveillance, and Defendant was followed to his residence directly after the transaction in the parking lot, at which point he was viewed entering the residence, and his car was spotted parked at that same address two weeks later.  DEA agents transported the black duffel bag containing drugs to the DEA office in Los Angeles, where the contents of the duffel bag tested positive for methamphetamine, and where the contents were

18

swapped for sham methamphetamine.  Following the switch, the UC agent had several additional recorded phone conversations with Yadira during which the two agreed to meet at a location in Atlanta to exchange the drugs.   After the sham drugs were transferred to Yadira and Fernando and they transported the sham drugs to their residence, DEA Atlanta agents executed a search at their residence and arrested Yadira and Fernando.  (Russell Aff. ¶¶ 11-25).

The Russell Affidavit provided a sufficient nexus between Defendant's participation in the alleged drug conspiracy and the Subject Property to authorize the First Warrant.  The Russell Affidavit established Defendant's connection to Yadira as her "associate" when Defendant called the UC agent to arrange to meet the agent at the California mall parking lot.  The affidavit established Defendant's connection to the Subject Property through DMV records, Defendant's driver's license, the UC agent's personal identification, and surveillance.  DMV records identified Defendant as the owner of the black Toyota Corolla and listed as his residence the address of the Subject Property.  Agents observed him drive to the Subject Property immediately after the transaction in the parking lot and walk inside.  Two weeks later, they saw the black Toyota Corolla parked outside the same home. These facts supplied probable cause that Defendant lived at that location.

The Court has removed the alleged tainted misrepresentation, and then stepped back to see if there remains sufficient content in the Russell Affidavit to support a finding of probable cause. Kapordelis, 569 F.3d at 1309. My determination is that there remains sufficient content to support a finding of probable cause to believe that evidence of drug trafficking and conspiracy to distribute controlled substances and possess with intent to distribute would be found at the Subject Property. See United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009) (sufficient nexus created based on officer following defendant back to his residence after a controlled purchase and affidavit detailing the officer's experience and training in narcotics investigations and his belief that the defendant's residence would contain evidence of the distribution of narcotics); United States v. Bradley, 644 F.3d 1213, 1263-64 (11th Cir. 2011) ("a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause"); United States v. Meryl, 322 F. App'x 871, 874 (11th Cir. 2009) (holding that probable cause supported the search warrant where after a completed sale of cocaine to a confidential informant, agents followed the defendant to his home and watched him go inside, "[c]ombined with the district court's common-sense finding that 'drug dealers are likely to keep evidence of their drug business at

20

home.'").  In this case, the Russell Affidavit supplied more than sufficient facts to establish a "fair probability" that evidence of drug trafficking and conspiracy would be found at 1528 E. 41st Place, Los Angeles, California.

Although the Government concedes that Agent Russell's affidavit misstated that Defendant received $4,000 in exchange for delivering the duffel bag of drugs to the undercover agent in California, Defendant has failed to make a sufficiently strong preliminary showing that Agent Russell made that misstatement either deliberately or with reckless disregard for the truth, and that such misstatement negated the probable cause determination.   Defendant has failed to offer any proof that the affiant, Agent Russell, had the requisite intent, as required under Franks.  See United States v. Flowers, 531 F. App'x 975, 981 (11th Cir. 2013) (citing Franks, 438 U.S. at 171). Accordingly, for all the reasons stated, Defendant is not entitled to a Franks hearing as to the First Warrant executed on April 6, 2018 based on the Russell Affidavit.

### C.    The Gray Affidavit and the Second Warrant

For the same or similar reasons, Defendant's motion to suppress evidence and request for an evidentiary hearing with respect to the Second Warrant also fails.

The Second Warrant authorized the search of ten telephones seized from Defendant's residence pursuant to the First Warrant.  (Doc. 56-2).  Defendant has

21

identified one omission in the Gray Affidavit that he contends justifies suppression of all evidence seized pursuant to the First and Second Warrants–i.e., that the Gray Affidavit failed to inform Judge Walker that the Russell Affidavit supporting the First Warrant contained the false statement that Defendant was paid $4,000 for delivering methamphetamine to an undercover DEA agent. (Doc. 56 at 2). Defendant argues that this omission was material information necessary to Judge Walker's determination that probable cause existed for the search of the phones, and therefore a Franks hearing is required to determine whether any and all evidence seized as a result of the search of the phones should be suppressed. (Id. at 4-6).

As noted earlier, to be entitled to an evidentiary hearing on a motion to suppress based on omissions in a search warrant affidavit, a defendant must make a "substantial preliminary showing" that the affiant made an omission, either intentionally or with reckless disregard for the truth, and that the omission was necessary to the finding of probable cause. Franks, 438 U.S. at 171-72; Cross, 928 F.2d at 1040.

To determine whether the alleged omission was material, the Court first will disregard those portions of the Russell Affidavit that Defendant has shown are arguably false or misleading. See Franks, 438 U.S. at 171-72 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains

22

sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); <u>Cross</u>, 928 F.2d at 1040.  Then, looking at the Gray Affidavit with the omitted fact in mind, the Court must determine whether inclusion of the omitted fact would have prevented a finding of probable cause.  <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1327 (11th Cir. 1997) (noting that "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause").

In this case, the undersigned has already concluded that the Russell Affidavit contained sufficient content to support a finding of probable cause, and that Defendant had failed to make a sufficient preliminary showing that an evidentiary hearing was warranted; nor has he offered any proof that the affiant had the requisite intent to mislead as required under <u>Franks</u>.  The same applies to the Second Warrant and the Gray Affidavit.

With regard to the Gray Affidavit, Defendant concedes in his reply brief that even if the omitted information had been included in the Gray Affidavit, "the affidavit would still support a finding of probable cause." (Doc. 63 at 2 n.2).  Defendant merely argues that if the Court finds that the First Warrant lacked probable cause (due to Russell's misstatement that Defendant received money from the undercover agent),

23

warranting suppression of the evidence seized at his residence, then all evidence seized pursuant to the Second Warrant should also be suppressed as fruit of the poisonous tree. (Id.; see also Doc. 56 at 5).  As noted above, however, I have not found that the alleged false statement in Russell's Affidavit was necessary to the finding of probable cause as to the First Warrant.  Accordingly, I do not recommend that all evidence seized pursuant to the Second Warrant be suppressed as fruit of the poisonous tree.

For all the reasons stated, Defendant has failed to establish that the alleged misrepresentation in Russell's Affidavit and alleged omission in Gray's Affidavit were essential to the findings of probable cause.  Defendant has also failed to meet his burden to make a sufficient preliminary showing that a Franks evidentiary hearing is warranted for either the first or second search warrants and supporting affidavits. Setting aside the statement in the Russell Affidavit that Defendant contends falsely stated that Defendant received $4,000 from the UC agent during the March 20, 2018 transaction, Judge Sagar had more than ample probable cause, based on the other facts contained in the Russell Affidavit and the demonstrated links between Defendant, his co-defendants/co-conspirators, and the UC agent discussed above, to believe that evidence of drug trafficking activity, including distribution and possession with intent to distribute controlled substances, and/or conspiracy to distribute and possess with

24

intent to distribute controlled substances, probably would be found at the Subject Property.  See Martin, 297 F.3d at 1314 (stating that to establish a finding of probable cause, a search warrant affidavit must contain "sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched").

With regard to the Second Warrant, for the reasons discussed above, and as Defendant concedes, even if Agent Gray had told Judge Walker about the error in the Russell Affidavit, there was still more than ample probable cause, based on the facts contained in the Gray Affidavit, to believe that evidence of drug activity would be found in the phones seized at the Subject Property.[2]

―――――――――――――

[2]  Among the facts set forth in the Gray Affidavit were the following: After Yadira and Fernando were arrested, each waived their Miranda rights, spoke with agents, and admitted participation in the shipment and transportation of drugs from California to Atlanta.  Toll records established multiple telephone contacts between Yadira and Defendant's phone number ending in 0798 (the same phone Defendant used to call the UC agent) the morning of March 20, 2018 before Defendant delivered drugs to the UC agent (Gray Aff. ¶ 29(a)).  During the same time period, using the same phone, Defendant made calls to three different Mexican telephone numbers with the same area code as a known Mexican drug trafficker, "Flaco" (id. ¶ 29(b)), and just minutes after Yadira was arrested in Atlanta, Defendant received a phone call and then a text from a Mexican telephone number, after which Defendant ceased making any outgoing calls or texts (id. ¶ 29(c)).  The Gray Affidavit indicates that based on those facts and the ongoing investigation, the investigating agents believed that Flaco reported Yadira's arrest to Defendant, which caused him to stop using the phone ending in telephone number 0798 (id. ¶29(c)(i)).  The affidavit further indicates that during the

**IV.**   **CONCLUSION**

For all the reasons stated, I **RECOMMEND** that Defendant's motions to suppress evidence and for a <u>Franks</u> hearing (Docs. 45, 56) be **DENIED**.

In addition, it appearing that there are no further pretrial or discovery matters to bring before the undersigned, it is therefore **ORDERED** that this case be and is hereby **CERTIFIED** as ready for trial.

---

search of Defendant's residence and the cars parked at the Subject Property, in addition to the ten telephones located and seized, agents found Defendant's wallet with his California driver's license, a bag containing approximately 2.24 grams of methamphetamine, a Glock handgun, and $23,890 in U.S. currency. (<u>Id.</u> ¶ 30). The Gray Affidavit states that, "This investigation has established that GONZALEZ-ARREOLA and his co-conspirators used multiple telephones to coordinate a drug shipment from a Mexico-based drug source of supply between California and the Atlanta, Georgia area.  The facts set forth herein establish a complex pattern of activity by this enterprise, which your affiant submits makes it even more likely that the SUBJECT TELEPHONES contain the evidence of drug trafficking activity described in Attachment B."  (<u>Id.</u> ¶ 34).

26

AO 72A
(Rev.8/8
2)

**IT IS SO RECOMMENDED**, this 27th day of September, 2018.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

27